IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK BOUVENZIER AS ATTORNEY IN FACT FOR GEORGE W. BOUVENZIER, III AND LYNN S. BOUVENZIER,<br>Plaintiff,<br>v.<br>AMICA MUTUAL INSURANCE COMPANY,<br>Defendant. | CIVIL ACTION<br>NO. 26-5373 |

**OPINION**

**Slomsky, J.** **October 20, 2026**

## I. INTRODUCTION

Defendant Amica Mutual Insurance Company ("Amica") issued to George W. Bouvenzier, III and Lynn S. Bouvenzier (the "Bouvenziers")[1] an insurance policy covering their real and personal property in Newtown, Pennsylvania. (See Doc. No. 1 Ex. B ¶¶ 1–3.) While the policy was in effect, a fire-suppression sprinkler burst in the master bedroom of the Bouvenziers' home, causing water damage to their residence and personal property. (Id. ¶ 5.) The Bouvenziers submitted a claim for benefits to Amica, but Amica and the Bouvenziers could not agree on the amount of damage and the insurance payment due. (See id. ¶ 7.)

On July 10, 2026, the Bouvenziers filed a Complaint in the Court of Common Pleas of Philadelphia County, Pennsylvania, alleging breach of contract (Count I) and bad faith pursuant to

[1] The named Plaintiff in this case is Mark Bouvenzier as attorney in fact for George W. Bouvenzier, III and Lynn S. Bouvenzier. (Doc. No. 1 Ex. B.) Mark Bouvenzier acts pursuant to limited durable powers of attorney executed on behalf of George and Lynn Bouvenzier. (Id. ¶ 1.) For purposes of clarity, this Opinion uses "the Bouvenziers" to refer to Plaintiff.

42 Pa. Cons. Stat. § 8371 (Count II) (Doc. No. 1 Ex. B). Amica timely removed the case to this Court (Doc. No. 1). On August 6, 2026, Amica filed a Motion to Dismiss the Complaint (Doc. No. 8), arguing this case is premature because the insurance policy requires the parties to submit to appraisal of the loss. The Motion to Dismiss (Doc. No. 8) is now ripe for disposition.

## II. BACKGROUND[2]

The Bouvenziers own real property located at 20 Hillyer Lane, Newtown, PA, 18940 (the "Property"). (Doc. No. 1 Ex. B ¶ 1.) The Property was insured by Amica under a homeowner's insurance policy numbered 66073721KE (the "Policy"), which covered real and personal property. (Id. ¶ 3.) The Policy contains an appraisal provision in Section I, which reads as follows:

> **SECTION I – CONDITIONS**
>
> ....
>
> **F. Appraisal**
> If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the **residence premises** is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.
>
> Each party will:

---

[2] The following facts are taken from the Complaint and exhibits attached to the Complaint (Doc. No. 1 Ex. B). Additionally, some facts are taken from the Policy and the correspondence between Amica and the Bouvenziers' public adjuster Hillis Adjustment Agency, Inc. ("Hillis"), which appear as exhibits to Amica's Motion to Dismiss (See Doc. No. 8 Exs. A, B). In ruling on a motion to dismiss, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Because the Policy and correspondence between Amica and Hillis form the basis of the Bouvenziers' claims, the Court may consider them in ruling on the Motion to Dismiss.

1. Pay its own appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

(Doc. No. 8 Ex. A at 35.) Additionally, a paragraph in the Policy titled "Suit Against Us" states "[n]o action can be brought against [Amica] unless there has been full compliance with all of the terms under Section I of this policy." (Id.)

On February 10, 2026, while the Policy was in effect, a fire-suppression sprinkler burst in the master bedroom on the Property's first floor, releasing "thousands of gallons of water" and causing the Bouvenziers to "sustain[] a sudden and accidental direct physical loss." (Doc. No. 1 Ex. B ¶ 5.) In addition to damage to their dwelling, the water also caused extensive damage to the Bouvenziers' personal property, including a "substantial model-train collection" stored in the basement. (Id. ¶¶ 8, 13.)

The Bouvenziers submitted a claim under the Policy, and Amica "determined that [the Bouvenziers] suffered a loss to property that was covered under . . . the policy." (See id. ¶ 7.) Then, the Bouvenziers and Amica each hired contractors to assess the damage to the dwelling and personal property. (See id. ¶ 9.) Regarding the dwelling damage, the Bouvenziers' contractor estimated repairs would cost $328,141.11. (Id. at Ex. A.) However, when Amica's specialists inspected the dwelling, they valued repair costs at a lower amount, $113,587.50. (Id. at Ex. H.) Unlike the Bouvenziers' valuation, Amica's estimate omitted repairs to kitchen cabinets, master bath vanity, and hardwired audio-video system. (Id.)

Similar disagreements arose over damage to the personal property. First, the parties could not agree on the moving and storage costs for the personal property. The Bouvenziers hired a specialist to inventory and store the damaged items. (See id. at Ex. B.) The specialist submitted an invoice for $109,364.84 for those services. (Id.) But Amica's contractor "issued a comparative

estimate cutting [the value of services] by nearly half" to $51,876.22. (Id. ¶ 10.) In calculating this amount, Amica's contractor did not conduct an in-person review of the damaged personal property or review the "item-by-item inventory spreadsheet, corresponding photographs of every item, condition assessments, and detailed labor and material breakdowns" the Bouvenziers had provided. (Id. at Ex. D.) Second, the parties disagreed on the extent of personal property in need of repair. The Bouvenziers' contractor estimated the personal property damage to be $671,334.37[3] for roughly 7,000 items.[4] (Id. ¶ 5, Ex. D.) But the assessment prepared by Amica's adjuster estimated personal property damage of $12,814.42 for 868 items. (Doc. No. 10 Ex. B.)

On multiple occasions, the Bouvenziers' public adjuster, Hillis Adjustment Agency, Inc. ("Hillis") contacted Amica to inform them the Bouvenziers deemed Amica's estimates for dwelling and personal property coverage inadequate. (Doc. No. 1 Ex. B at Exs. D, G, H.) On May 5, 2026, when Hillis asked Amica why it issued an estimate without an adequate investigation into the personal property damage, Amica responded that it "typically" does not complete in-person inspections for "salvageable contents" and would rely on its specialist's valuation of $51,876.22. (Id. at Exs. D, F.) However, Amica informed Hillis that it could provide "any other documentation" to Amica's specialist for further review. (Id. at Ex. D.) Hillis contacted Amica again on May 12, 2026, May 27, 2026, and June 1, 2026 to relay its concerns about dwelling and personal property

[3] In the Response to the Motion to Dismiss, the Bouvenziers assert that the personal property damage totals $777,369.37. (See Doc. No. 10 at 4, 12.) This figure does not appear in the Complaint, its exhibits, or other documents that are integral to the Complaint. See Pension Benefit Guar. Corp., 998 F.2d at 1196. Because the focus of a Motion to Dismiss is the allegations in the Complaint, facts that only appear in a Response to a Motion to Dismiss may not be considered. For purposes of this Opinion, the value of personal property damage is $671,334.37, the amount appearing in the Complaint.

[4] The Bouvenziers do not explain why the number of personal property items is so high. (See Doc. No. 1 Ex. B.) From the Complaint, it appears many of the items comprised "a substantial model-train collection and its display layouts." (Id. ¶ 8.)

coverage, but Amica did not alter its estimates. (Id. ¶ 12, Exs. F, G, H.)

On June 22, 2026, Amica sent Hillis a letter in which it acknowledged the parties "disagree regarding the amount of loss," and "demand[ed] appraisal to settle all open claims under [the Policy]." (Doc. No. 8 Ex. B at 1.) In the letter, Amica named an appraiser and asked the Bouvenziers to also "name an appraiser within twenty (20) days of the date of the letter, as required by the Policy." (Id. at 1–2.)

The Bouvenziers did not pursue an appraisal. Instead, on June 24, 2026, they commenced this action by filing a Praecipe for Writ of Summons in the Court of Common Pleas of Philadelphia County, Pennsylvania (Doc. No. 1 Ex. A). And on July 10, 2026, the Bouvenziers filed the Complaint alleging breach of contract (Count I) and bad faith pursuant to 42 Pa. Cons. Stat. § 8371 (Count II) (Id. at Ex. B). In the Complaint, the Bouvenziers allege Amica "failed to reasonably address the disputed personal property and dwelling damage, failed to provide a reasonable explanation for its reductions and omissions, and failed to pay all benefits owed under the policy." (Id. ¶ 14.) On July 30, 2026, Amica removed the case to this Court based upon diversity of citizenship jurisdiction, 28 U.S.C. § 1332(a) (Doc. No. 1).

On August 6, 2026, Amica filed a Motion to Dismiss the Complaint (Doc. No. 8). In the Motion to Dismiss, Amica urges the court to dismiss, or, in the alternative, to stay these proceedings because the Policy requires the Bouvenziers to arbitrate their claims before filing suit. (See id.) On August 19, 2026, the Bouvenziers filed a Response in Opposition (Doc. No. 10). On August 26, 2026, Amica filed a Reply (Doc. No. 11).

## III. STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). After Iqbal it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Iqbal, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 556 U.S. at 678).

Applying the principles of Iqbal and Twombly, the Third Circuit Court of Appeals in Santiago v. Warminster Township, set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

629 F.3d 121, 130 (3d Cir. 2010) (alteration in original) (quoting Iqbal, 556 U.S. at 675, 679). The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

## IV. ANALYSIS

In its Motion to Dismiss, Amica asks the Court to dismiss, or in the alternative, to stay both the breach of contract (Count I) and bad faith (Count II) claims. (See Doc. No. 8.) Each claim will be discussed in turn.

### A. Count I (Breach of Contract)

In Count I, the Bouvenziers allege Amica "breached its contractual obligations by failing and refusing to fully indemnify [them] for a covered loss under the policy." (Doc. No. 1 Ex. B ¶ 17.) Amica maintains Count I should be dismissed because Amica has invoked its right to appraisal under the Policy, and therefore, the Bouvenziers must follow the appraisal provisions of the Policy before filing suit. (Doc. No. 8 at 6.)

Pennsylvania law encourages the settlement of disputes between insurance companies and their policyholders by appraisal. Ice City v. Ins. Co. of N. Am., 314 A.2d 236, 241 (Pa. 1974) ("[The] settlement of disputes by . . . appraisal is the approved public policy of th[e] Commonwealth."). As such, appraisal provisions in insurance policies are generally enforced. Id. at 240. To determine if an appraisal provision bars litigation of an insurance dispute, Pennsylvania law distinguishes between (a) loss disputes and (b) coverage disputes. See, e.g., Prof'l, Inc. v. Mut. Benefit Ins. Co., No 1155 WDA 2019, 2020 WL 6743978, at *6 (Pa. Super. Ct. Nov. 17, 2020). A loss dispute occurs when the insurer admits liability—i.e., that the loss is covered under the policy—but the parties disagree on the "dollar value" of that loss. Ice City, 314 A.2d at 240.

For loss disputes, appraisal clauses are enforceable. Prof'l Inc., 2020 WL 6743978, at *6 ("[O]nce there is a dispute over the amount of loss and either party demands an appraisal, the [appraisal] clause becomes mandatory and the other party must select an appraiser."). By contrast, a coverage dispute occurs when the insurance company denies liability by asserting that the type of loss is excluded from the policy. See Ice City, 314 A.2d at 239. Appraisal is not mandatory for coverage disputes, because "a coverage dispute is not within the scope of an appraisal clause . . . ." Prof'l Inc., 2020 WL 6743978, at *7.

In the Motion to Dismiss, Amica asserts that the parties dispute loss and not coverage, because the central issue is "the amount owing on Plaintiff's casualty property loss claim." (Doc. No. 8 at 8.) As such, Amica concludes that the Policy's appraisal provision is mandatory on the parties. (Id.) By contrast, the Bouvenziers argue appraisal is inappropriate because this case involves a coverage dispute. (See Doc. No. 10 at 6.) The Bouvenziers contend Amica has denied coverage on certain items, emphasizing (1) Amica's failure to pay for dwelling damage to their bathroom vanity, kitchen cabinets, and sound system; and (2) Amica's personal property valuation that reduced the Bouvenziers' 7,000 item list to only 868 items. (Id. at 3–4.) Amica counters that these disagreements on dwelling and personal property damage "concern valuation of line items, not outright denials of 'coverage.'" (Doc. No. 11 at 4.)

While the line between coverage and loss disputes is not always clear, the determinative factor is whether the insurance company has admitted liability for the loss. Bussie v. Am. Sec. Ins. Co., No. 20-3519, 2021 WL 2206282, at *4–5 (E.D. Pa. June 1, 2021). A coverage dispute occurs "when an insurer refuses to cover a loss because the coverage provisions of a policy do not include the asserted loss or because the loss is subject to a policy exclusion . . . ." Id. at *4. So, for example, a coverage dispute existed when a policyholder plaintiff intentionally set fire to his home,

and the insurance policy excluded intentional acts from coverage. Robinson v. Allstate Prop. & Cas. Ins. Co., 306 F. Supp. 3d 672, 679 (E.D. Pa. 2018). Because the insurance company claimed a policy exclusion applied to the plaintiff's intentional act and prevented payment for the damage, a coverage dispute existed. Id.

On the other hand, a loss dispute occurs when the insurance company admits liability, but debates "the extent of damage or whether a covered peril is the cause of certain damage[.]" Williamson v. Chubb Indem. Ins. Co., No. 11-6476, 2012 WL 760838, at *4 (E.D. Pa. Mar. 8, 2012); Bussie, 2021 WL 2206282, at *4. For example, in Bussie, the insurance company agreed that the policy covered damage from a fire, but disagreed on the extent of repairs required. Id. at *5. In particular, the insurance company had "rejected almost 200 out of the 587 line items" on the plaintiff's estimate. Id. Even so, the court found the dispute was a loss dispute because the insurance company had "conced[ed] that the [p]olicy cover[ed] all fire loss damage." Id. The insurance company's rejection of line items did not create a coverage dispute, but instead "demonstrate[d] that there is a factual dispute as to the extent of damages and necessary repairs." Id. Thus, the dispute was a loss dispute, and therefore the appraisal provision was mandatory. Id.

In this case, the dispute between Amica and the Bouvenziers concerns loss, not coverage. Amica has conceded that the Policy covers damage from the burst sprinkler system and has not claimed a policy exclusion applies. (See Doc. No. 1 Ex. B. ¶ 7.) While the parties' valuations for dwelling and personal property damage differ, this disagreement involves the "extent of damage" and "necessity of repairs," not whether loss from the water leak is covered in the first place. Bussie, 2021 WL 2206282, at *5. See also Williamson, 2012 WL 760838, at *4 (holding "disagreement over the necessary repairs and methods of repair from the covered peril" constituted loss dispute); Correnti v. Merchs. Preferred Ins. Co., No. 12-6303, 2013 WL 373273, at *3

(mandating appraisal where parties disputed "extent of damage").

This conclusion is supported by the language in the Complaint. According to the Complaint, Amica "determined that [the Bouvenziers] suffered a loss to property that was covered under the terms and conditions of the policy but failed . . . to indemnify [them] completely for the loss." (Id.) Amica's failure to indemnify "completely" does not amount to a denial of coverage. Instead, Amica has agreed that the damage from the water "was covered" but only disagrees over the extent of loss.

Nevertheless, the Bouvenziers cite the Banks case to support their argument that Amica's failure to compensate for certain line items transforms this case into a coverage dispute. In Banks, the plaintiffs' bathroom collapsed and caused damage to the bathroom and other areas of the home. Banks v. Allstate Ins. Co., No. 91-6982, 1992 WL 102885, at *1 (E.D. Pa. May 7, 1992). While the insurance company agreed to compensate plaintiffs for damage to the bathroom, it denied coverage for damage to other rooms of the home. Id. The court found a coverage dispute existed with respect to those rooms because the insurance company had denied coverage under the policy, and "[t]he amount of loss from the admitted coverage [was] considerably less than the losses arising from the disputed coverage." Id. at *3. Therefore, the court refused to enforce the appraisal clause. Id.

The Bouvenziers' comparison to Banks is unavailing. Amica has not denied coverage for water damage to any area of the Bouvenziers' home. Instead, Amica concedes that damage from the water leak is covered under the Policy, but disagrees about whether certain line items need repair. In the three decades since Banks, courts in this District have repeatedly rejected the argument that "an insurer's refusal to compensate for certain line items in a plaintiff's estimate of damages compels a conclusion that there is a coverage dispute[.]" Bussie, 2021 WL 2206282, at

*5; Williamson, 2012 WL 760838, at *4. Insurance companies and policyholders may disagree about the line items in need of repair. "While these disagreements will necessarily result in discrepancies between line items in the two [parties'] estimates, they in no way suggest that coverage is in dispute." Bussie, 2021 WL 2206282, at *5.

Accordingly, the dispute between Amica and the Bouvenziers is a loss dispute. As a result, the Bouvenziers must comply with the appraisal provision in the Policy before pursuing their breach of contract claim in this Court. Therefore, Count I of the Complaint will be dismissed without prejudice.[5]

**B. Count II (Bad Faith)**

In Count II of the Complaint, the Bouvenziers allege Amica acted in bad faith pursuant to 42 Pa. Cons. Stat. § 8371.[6] The Bouvenziers claim Amica "acted in bad faith toward [them] in connection with the investigation, adjustment, evaluation, handling, and payment" of their claims. (Doc. No. 1 Ex. B ¶ 20.) In its Motion to Dismiss, Amica urges the Court to dismiss Count II or, alternately, to stay Count II pending the outcome of appraisal. (Doc. No. 8 at 8–9.)

Pennsylvania's bad faith statute provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> 1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
> 2) Award punitive damages against the insurer.
> 3) Assess court costs and attorney fees against the insurer.

---

[5] Count I will be dismissed without prejudice because "appraisal . . . is subject to limited judicial review." Bussie, 2021 WL 2206282, at *6 (quoting Boulevard Assocs. v. Seltzer P'ship, 664 A.2d 983, 987 (Pa. Super. Ct. 1995).

[6] Amica does not argue that Count II falls within the scope of the appraisal clause. (See Doc. No. 8 at 8–9.) Therefore, the Court will not address the application of the appraisal clause to Count II.

42 Pa. C.S. § 8371. The statute does not define "bad faith," but the Pennsylvania Superior Court defines bad faith on the part of an insurer as "any frivolous or unfounded refusal to pay proceeds of a policy." Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994).

To succeed on a bad faith claim, a plaintiff must typically show that the insurer "(1) did not have a reasonable basis for denying benefits under the policy; and (2) knew or recklessly disregarded its lack of reasonable basis in denying the claim." Yandrisovitz v. Ohio State Life Ins. Co., No. 18-1036, 2018 WL 4203840, at *4 (E.D. Pa. Aug. 31, 2018) (citing W.V. Realty, Inc. v. N. Ins. Co., 334 F.3d 306, 312 (3d Cir. 2003). The insurer's conduct need not be fraudulent, but "'mere negligence or bad judgment is not bad faith.'" Nw. Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005) (quoting Brown v. Progressive Ins. Co., 860 A.2d 493, 501 (Pa. 2004)). The statute also "encompasses a broad range of insurer conduct, including unreasonable delay in evaluating claims, failure to communicate with the insured, frivolous refusal to pay, inadequate investigation into the factual basis of the insurance claim, and failure to conduct legal research concerning coverage." Campanile v. Hanover Ins. Co., No. 25-3028, 2025 WL 2350863, at *2 (E.D. Pa. Aug. 13, 2025) (internal citations omitted).

Because bad faith claims are fact-specific, to survive a motion to dismiss, "a plaintiff must plead specific facts as evidence of bad faith and cannot rely on conclusory statements." Toner v. GEICO Ins. Co., 262 F. Supp. 3d 200, 208 (E.D. Pa. 2017) (citing Smith v. State Farm Mut. Auto. Ins. Co., 506 Fed. App'x 133, 136 (3d Cir. 2012)). To that end, "[a] plaintiff cannot merely say that an insurer acted unfairly, but instead must describe with specificity what was unfair." Id.

Here, the Bouvenziers' bad faith claim in Count II of the Complaint is premised on the following allegations regarding Amica's conduct in handling their insurance claim:

a) Lacking a reasonable basis for limiting, delaying, and/or underpaying benefits owed to Plaintiffs under the policy;

b) Knowing or recklessly disregarding that it lacked a reasonable basis for limiting, delaying, and/or underpaying Plaintiffs' claim;

c) Failing and/or refusing, without a reasonable basis, to pay all benefits owed for Plaintiffs' covered loss;

d) Failing to acknowledge and/or act promptly and reasonably upon written and/or oral communications from Plaintiffs and/or Plaintiffs' representatives;

e) Failing to conduct a prompt, thorough, fair, and reasonable investigation based upon all available information before limiting, delaying, and/or underpaying Plaintiffs' claim;

f) Failing to effectuate a prompt, fair, and equitable settlement of Plaintiffs' claim once Defendant's obligation to pay benefits under the policy became reasonably clear;

g) Misstating and/or mischaracterizing pertinent facts concerning the personal property portion of the claim, including Mason-Dixon Restoration's cooperation, the documentation provided in support of the claim, and the basis for Wardlaw Claims Service's reductions;

h) Failing to pay Plaintiffs' covered loss in a prompt and timely manner;

i) Acting in an unreasonable and dilatory manner during the adjustment of Plaintiffs' claim;

j) Treating Plaintiffs with reckless indifference and disregard under the circumstances;

k) Relying upon a remote comparative review to substantially reduce the personal property portion of the claim without an on-site inspection and without full review of the documentation submitted in support of the claim;

l) Failing to meaningfully re-evaluate the personal property portion of the claim after additional documentation was provided;

m) Failing to reasonably address documented omissions in the dwelling estimate, including the damaged kitchen cabinets, master bath vanity, and hardwired audio-video system; and

n) Offering and/or issuing benefits in an amount materially below the documented cost to repair, replace, restore, and/or otherwise address the covered damage, when Defendant knew or should have known that its position was unfair and unreasonable.

(Doc. No. 1 Ex. B ¶ 21.)

**1. Allegations of Amica's Mental State, Denial of Benefits, & Delay**

Paragraphs (a)–(e), (h)–(j), and (n) of the Complaint set forth conclusory allegations that are insufficient to withstand a Motion to Dismiss.

Several courts in the Third Circuit have considered similarly pled bad faith claims and concluded that they lack specific factual details and consist of only "bare-bones allegations." For example, in Mills v. Allstate Insurance Co., the court held that the plaintiff's similar allegations of bad faith were insufficient to state a claim under Rule 12(b)(6). No. 15-4824, 2015 WL 5707303 (E.D. Pa. Sept. 29, 2015). These claims included allegations of "failing to pay the full amount owed to [plaintiff] under the polic[y]," "not having a reasonable basis for denying Plaintiff's benefits under the policy and . . . knowingly or recklessly disregarding its lack of reasonable basis when it denied Plaintiff's claim," and "failing to effectuate a prompt, fair and equitable settlement of Plaintiff's claim when its liability under the policy became reasonably clear." Id. at *3. The court found these allegations to be "devoid of factual specificity." Id. Without sufficient facts, the court noted the only conclusions it could draw from the complaint were that "(1) Plaintiff's insurance policy with Defendant provided homeowners coverage, (2) Plaintiff suffered injury [from] . . . damage; (3) Plaintiff complied with the terms of the insurance policy in seeking coverage, and (4) Defendant has declined to settle Plaintiff's claim." Id. As such, the court deemed the allegations "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Id. (quoting Fowler, 578 F.3d at 210.)

Similarly, in Soldrich v. State Farm Fire and Casualty Co., the court dismissed the

plaintiff's bad faith claim after finding that the allegations in the complaint failed to state a plausible claim under Rule 12(b)(6). No. 15-1438, 2015 WL 7568442, at *4 (E.D. Pa. Nov. 25, 2015). Like the allegations in this case, the plaintiff premised his bad faith claim on the following:

> (a) failing to pay the full amount owed to him under the policies; (b) failing to timely pay the amounts owed; (c) scheming to defraud him; (d) recklessly disregarding its obligations under the policy; (e) accepting the premiums from him without intending to pay monies owed for covered losses; (f) fraudulently telling him that the losses were not covered despite evidence that they were; (g) claiming that losses were due to uncovered causes despite having no evidence to support that contention; (h) claiming that losses were due to uncovered causes despite evidence to support a covered loss; (i) unilaterally denying covered losses without proper investigation; and (j) falsely misrepresenting its responsibilities under the policy.

Id. The court found that these allegations lacked the requisite factual support to state a plausible claim under Rule 12(b)(6). Id. Consequently, the court dismissed Plaintiff's bad faith claim, holding that these "'cursory allegations assert that Defendant lacked a reasonable basis for denying Plaintiff's claim for benefits, but do not provide any factual allegations from which the Court could make a plausible inference that Defendant knew or recklessly disregarded its lack of a reasonable basis for denying benefits.'" Id. (quoting Pasqualino v. State Farm Mut. Auto. Ins. Co., No. 15-0077, 2015 WL 3444288, at *5 (E.D. Pa. May 28, 2015)).

Here, the allegations in paragraphs (a)–(e), (h)–(j), and (n), like those of the plaintiffs in Mills and Soldrich, lack sufficient facts to survive Amica's Motion to Dismiss. While the Bouvenziers allege Amica "lack[ed] a reasonable basis for . . . underpaying benefits," "knowing[ly] or recklessly disregard[ed]" that lack of reasonable basis, and "[t]reated Plaintiffs with reckless indifference," the Bouvenziers plead no facts supporting Amica's lack of reasonable basis or mental state. Pasquilino, 2015 WL 3444288, at *5 (dismissing bad faith claim based on "Plaintiff's cursory allegations assert[ing] that Defendant lacked a reasonable basis for denying

Plaintiff's claim for benefits"). The Bouvenziers' allegations that Amica "[a]ct[ed] in an unreasonable and dilatory manner during the adjustment of Plaintiffs' claim" are also insufficient, as "there are no facts alleged in the Complaint that relate to the alleged delay." Soldrich, 2015 WL 7568442, at *4. In fact, the only conclusions that can be drawn from these allegations are that (1) the Bouvenziers had a homeowner's insurance policy with Amica, (2) their home was damaged by a water leak, and (3) Amica has offered the Bouvenziers a sum they deem inadequate. Mills, 2015 WL 5707303, at *3. Without specific factual details, these "bare-bones" allegations fail to plausibly allege bad faith.

Furthermore, these claims are premature. Even viewing the allegations in the Complaint in the light most favorable to the Bouvenziers, it is unclear whether Amica outright "denied" payment under the Policy or merely punted the issue to appraisal proceedings. Bad faith is "any frivolous or unfounded refusal to pay proceeds of a policy." Terletsky, 649 A.2d at 688. But the Bouvenziers may very well receive payment on their claim during appraisal proceedings.

**2. Allegations of Failure to Investigate**

While Paragraphs (g) and (k)–(m) of the Complaint admittedly contain some factual detail, they are still insufficient to withstand a Motion to Dismiss. As discussed supra, "bare-bones" allegations of failure to investigate are insufficient to plausibly allege bad faith. See, e.g., Litman v. Geico Cas. Co., 22-4530, 2023 WL 8091982, at *6–7 (E.D. Pa. Nov. 21, 2023). Instead, the plaintiff must plead facts demonstrating why the investigation was unreasonable. Priya Props., LLC v. Nationwide Assur. Co., 24-5485, 2024 WL 4765319, at *7 (E.D. Pa. Nov. 13, 2024). This often requires showing "(1) the timing of the alleged investigation, (2) the methods and procedures of the investigation, and (3) the length of the investigation from start to finish." Barbor v. State Farm Fire & Cas. Co., No. 24-521, 2024 WL 3678660, at *5 (E.D. Pa. Aug. 6, 2024). "Without additional facts regarding the investigation, correspondence between the parties, or unreasonable

conduct, 'the [c]ourt cannot infer bad faith' on the [d]efendant's part." Id. at *6 (quoting Cappuccio v. State Farm Fire & Cas. Ins. Co., No. 19-3025, 2020 WL 2307340, at *3 (E.D. Pa. May 8, 2020)).

Here, the Bouvenziers allege Amica "[f]ail[ed] to conduct a prompt, thorough, and reasonable investigation based upon all available information" by "[r]elying upon a remote comparative review to substantially reduce the personal property portion of the claim . . . without full review of the documentation provided." (Doc. No. 1 Ex. B ¶ 21.) While the Bouvenziers have attached some correspondence to the Complaint to support this contention, they fail to allege (1) when the "remote comparative review" occurred, (2) what the "remote comparative review" entailed, and (3) the length of the "remote comparative review." Barbor, 2024 WL 3678660, at *5. Without this information, the Complaint fails to plausibly allege why the "remote comparative review" was unreasonable.

The allegations that Amica "[m]isstated and/or mischaracterize[d] the pertinent facts concerning the personal property portion of the claim, including Mason-Dixon Restoration's cooperation . . . and the basis for Wardlaw Claims Service's reductions" fare no better. The Bouvenziers fail to allege which "pertinent facts" were misrepresented, who made the misrepresentations, or when the alleged misrepresentations occurred. Smith, 506 Fed. App'x at 136 (dismissing bad faith allegations of "misrepresenting coverage in the policy" when plaintiff failed to "explain[] what those misrepresentations may have been"). And while the paragraph identifies "Mason-Dixon Restoration's cooperation" and "Wardlaw Claims Service's reductions," providing these actors' names does not convert a conclusory statement into a plausible one. Barbor, 2024 WL 3678660, at *5 (dismissing allegations containing identifying names because plaintiffs "merely inserted these basic facts into . . . conclusory statements"). The Bouvenziers do not allege when, how, or with whom Mason-Dixon Restoration "cooperat[ed]." Nor do they

provide detail on which of "Wardlaw Claims Service's reductions" were unreasonable. More factual detail is necessary to plausibly allege bad faith by misrepresentation.

Furthermore, even when construing the allegations in Complaint in the light most favorable to the Bouvenziers, the exhibits attached to the Complaint undermine their charge that Amica "[f]ail[ed] to reasonably address documented omissions in the dwelling estimate," or did not fully "review . . . the documentation submitted in support of the [personal property] claim." In Exhibit F to the Complaint, Amica offered Hillis an explanation for why it did not conduct an in-person investigation of the personal property claim: "We typically do not complete inspections for the handling of salavgeable contents as [Amica's contractor] reviews documentation of salvageable contents from the vendor once received to confirm accuracy and pricing." (Doc. No. 1. Ex. B at Ex. F.) In the same correspondence, Amica conceded that its contractor "was provided with the attached estimate from [the Bouvenziers' contractor]," and even asked Hillis to provide "any other documentation" so Amica's contractor "can review further." (Id.) Viewing the response in this Exhibit in the light most favorable to the Bouvenziers, it does not plausibly show that Amica failed to review the provided documentation. Rather, it shows a "good faith effort to maintain an accurate claims assessment." Rivera v. Progressive Specialty Ins. Co., No. 26-787, 2026 WL 1279853, at *6 (E.D. Pa. May 11, 2026) (granting motion to dismiss when attachments to Complaint showed insurance company offering to "'reassess' its evaluation 'as new information comes in'").

Therefore, for all the reasons set forth above, the Bouvenziers have failed to plausibly allege bad faith, and Amica's Motion to Dismiss Count II of the Complaint will be granted.

## V. CONCLUSION

For all the foregoing reasons, Amica's Motion to Dismiss (Doc. No. 8) will be granted. Count I of the Complaint (Doc. No. 1 Ex. B) will be dismissed without prejudice. Count II of the Complaint will be dismissed. An appropriate Order follows.